1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10    ANDRE' BOSTON,

11              Plaintiff,                    No. CIV S-10-1782 KJM DAD P

12         vs.

13    V. GARCIA et al.,                       FINDINGS AND RECOMMENDATIONS

14              Defendants.

15    _____/

16              Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17    relief under 42 U.S.C. § 1983.  This matter is before the court on a motion for summary

18    judgment brought on behalf of defendants Garcia, Alkire, and Renauld.  Plaintiff has filed an

19    opposition to the motion, and defendants have filed a reply.

20                                       **BACKGROUND**

21              Plaintiff is proceeding on an amended complaint against defendants Garcia,

22    Alkire, and Renauld.  Therein, plaintiff alleges that he suffers from Sarcoidosis and is at

23    increased risk for complications if he is housed at a prison located at a high altitude.  On March

24    17, 2008, Chief Medical Officer Igbinosa at Pleasant Valley State Prison ("PVSP") requested a

25    transfer for plaintiff due to his medical condition.  On April 9, 2008, the Unit Classification

26    Committee ("UCC") reviewed plaintiff's case file and recommended a transfer for him to either

1

1   San Quentin State Prison or California Men's Colony.  Despite the UCC's recommendation,

2   however, defendant Garcia endorsed plaintiff for a transfer to the California Correctional Center

3   ("CCC").  According to plaintiff, CCC is another institution located at a high altitude, and his

4   transfer to that prison placed his health in danger.  (Am. Compl. at 8-9 & 21.)

5          Not long after plaintiff transferred to CCC, he filed an inmate appeal contesting

6   his transfer to that institution.  Plaintiff also saw Dr. Handke, an outside pulmonary specialist,

7   who confirmed that plaintiff suffers from Sarcoidosis.  Based on Dr. Handke's opinion, prison

8   officials at CCC requested a transfer for plaintiff to an institution located at a lower altitude.  On

9   July 16, 2008, the UCC reviewed plaintiff's case file and recommended a transfer for him to

10  California Medical Facility ("CMF") or Salinas Valley State Prison ("SVSP").  On the same day,

11  however, defendant Renauld denied plaintiff's inmate appeal contesting his transfer to CCC and

12  refused to authorize plaintiff's transfer because CCC is at a security level commensurate with

13  plaintiff's placement score.  On July 23, 2008, defendant Alkire reviewed plaintiff's case file and

14  the UCC's recommendation to transfer plaintiff to CMF or SVSP but endorsed plaintiff for a

15  transfer to High Desert State Prison ("HDSP").  According to plaintiff, HDSP is located at an

16  even higher altitude than CCC, and his transfer to HDSP placed his health in danger.  (Am.

17  Compl. at 9-14 & 21.)

18         After arriving at HDSP, plaintiff saw Dr. Hudson, an ENT, and Dr. Mashour, a

19  pulmonary specialist.  Both doctors recommended that prison officials transfer plaintiff to an

20  institution located at sea level.  On December 10, 2008, the Chief Medical Officer at HDSP

21  requested a transfer for plaintiff.  According to plaintiff, however, he did not actually receive a

22  transfer to Richard J. Donovan Correctional Facility until October 8, 2009.  In the meantime,

23  plaintiff alleges that his daily activities were significantly affected, and he had to use

24  supplemental oxygen for several months while awaiting his transfer to a suitable institution.

25  (Am. Compl. at 15-17, 19 & 21.)

26  /////

2

1   Plaintiff claims that the defendants have been deliberately indifferent to his

2   serious medical needs in violation of the Eighth Amendment.  In terms of relief, plaintiff requests

3   an award of monetary damages.  (Am. Compl. at 20-25.)

4   **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

5   Summary judgment is appropriate when the moving party "shows that there is no

6   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

7   Fed. R. Civ. P. 56(a).

8   Under summary judgment practice, the moving party "initially bears the burden of

9   proving the absence of a genuine issue of material fact."  In re Oracle Corp. Securities Litigation,

10  627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

11  The moving party may accomplish this by "citing to particular parts of materials in the record,

12  including depositions, documents, electronically store information, affidavits or declarations,

13  stipulations (including those made for purposes of the motion only), admission, interrogatory

14  answers, or other materials" or by showing that such materials "do not establish the absence or

15  presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to

16  support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden

17  of proof at trial, "the moving party need only prove that there is an absence of evidence to

18  support the nonmoving party's case."  Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at

19  325.).  See also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after

20  adequate time for discovery and upon motion, against a party who fails to make a showing

21  sufficient to establish the existence of an element essential to that party's case, and on which that

22  party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure

23  of proof concerning an essential element of the nonmoving party's case necessarily renders all

24  other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so

25  long as whatever is before the district court demonstrates that the standard for entry of summary

26  judgment, . . ., is satisfied."  Id. at 323.

1          If the moving party meets its initial responsibility, the burden then shifts to the

2  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4  establish the existence of this factual dispute, the opposing party may not rely upon the

5  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6  form of affidavits, and/or admissible discovery material, in support of its contention that the

7  dispute exists.  See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing

8  party must demonstrate that the fact in contention is material, i.e., a fact that might affect the

9  outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

10  248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13  1436 (9th Cir. 1987).

14          In the endeavor to establish the existence of a factual dispute, the opposing party

15  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

18  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (citations omitted).

20          "In evaluating the evidence to determine whether there is a genuine issue of fact,"

21  the court draws "all reasonable inferences supported by the evidence in favor of the non-moving

22  party."  Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  It is

23  the opposing party's obligation to produce a factual predicate from which the inference may be

24  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

25  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

26  party "must do more than simply show that there is some metaphysical doubt as to the material

1  facts . . . .   Where the record taken as a whole could not lead a rational trier of fact to find for the

2  nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation

3  omitted).

**OTHER APPLICABLE LEGAL STANDARDS**

4

5  I.  <u>Civil Rights Act Pursuant to 42 U.S.C. § 1983</u>

6          The Civil Rights Act under which this action was filed provides as follows:

> 7  Every person who, under color of [state law] . . . subjects, or causes
> to be subjected, any citizen of the United States . . . to the
> 8  deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> 9  law, suit in equity, or other proper proceeding for redress.

10  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

11  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  <u>See</u>

12  <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658 (1978); <u>Rizzo v. Goode</u>, 423 U.S. 362

13  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

14  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

15  omits to perform an act which he is legally required to do that causes the deprivation of which

16  complaint is made."  <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 (9th Cir. 1978).

17          Moreover, supervisory personnel are generally not liable under § 1983 for the

18  actions of their employees under a theory of <u>respondeat</u> <u>superior</u> and, therefore, when a named

19  defendant holds a supervisorial position, the causal link between him and the claimed

20  constitutional violation must be specifically alleged.  <u>See</u> <u>Fayle v. Stapley</u>, 607 F.2d 858, 862

21  (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

22  allegations concerning the involvement of official personnel in civil rights violations are not

23  sufficient.  <u>See</u> <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

24  II.  <u>The Eighth Amendment and Inadequate Medical Care</u>

25          The unnecessary and wanton infliction of pain constitutes cruel and unusual

26  punishment prohibited by the Eighth Amendment.  <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986);

1   Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

2   In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove

3   that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

4   acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

5   Seiter, 501 U.S. 294, 298-99 (1991).

6          Where a prisoner's Eighth Amendment claims arise in the context of medical

7   care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

8   deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth

9   Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

10  and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050,

11  1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

12  (9th Cir. 1997) (en banc).

13         A medical need is serious "if the failure to treat the prisoner's condition could

14  result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

15  McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical

16  need include "the presence of a medical condition that significantly affects an individual's daily

17  activities."  Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner

18  satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v.

19  Brennan, 511 U.S. 825, 834 (1994).

20         If a prisoner establishes the existence of a serious medical need, he must then

21  show that prison officials responded to the serious medical need with deliberate indifference.

22  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

23  deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

24  which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

25  (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

26  to medical care, however, "the indifference to his medical needs must be substantial.  Mere

6

1    'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

2    Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

3    105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

4    negligence in diagnosing or treating a medical condition, without more, does not violate a

5    prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

6    indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

7    ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835

8    (quoting Whitley, 475 U.S. at 319).

9           Delays in providing medical care may manifest deliberate indifference.  Estelle,

10   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

11   providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

12   1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

13   1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

14   Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

15   prisoner need not show his harm was substantial; however, such would provide additional

16   support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

17   v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

18          Finally, mere differences of opinion between a prisoner and prison medical staff

19   or between medical professionals as to the proper course of treatment for a medical condition do

20   not give rise to a § 1983 claim.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir. 2012);

21   Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Sanchez v.

22   Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.

23   1981).

24                                        **ANALYSIS**

25          Defense counsel argues, and the undersigned finds, that defendants have borne

26   their initial burden of demonstrating that there is no genuine issue of material fact with respect to

                                              7

1   the adequacy of the medical care provided to plaintiff.  Specifically, the evidence submitted by

2   the defendants in support of their motion for summary judgment establishes the following.

3   Between December 2007 and October 2009, plaintiff was a state prisoner incarcerated at PVSP,

4   CCC, or HDSP.  In April 2008, defendant Garcia was employed as a Classification Services

5   Representative ("CSR").  In July 2008, defendant Alkire was also employed as a CSR.  In July

6   2008, defendant Renauld was employed as an Associate Warden at CCC.  (Defs.' SUDF 1-4,

7   Garcia Decl., Alkire Am. Decl., Renauld Decl., Am. Compl. at 2.)

8          On March 17, 2008, Chief Medical Officer Igbinosa at PVSP issued a medical

9   recommendation, recommending that prison officials transfer plaintiff due to "his medical

10  conditions that increase his risk of complications from potential Valley Fever infections."  Due to

11  HIPPA rules, CSRs do not have access to an inmate's medical records.  CSRs are notified of an

12  inmate's medical conditions through CDC 128C Medical Chronos and CDC 1845 Disability

13  Placement Program Verification documents.  Medical chronos and Disability Placement Program

14  Verification documents are completed by medical staff and placed in an inmate's central file.

15  (Defs.' SUDF 5-6 & Ex. F-1, Garcia Decl., Alkire Am. Decl.)

16         On April 9, 2008, plaintiff appeared before the PVSP UCC concerning Chief

17  Medical Officer Igbinosa's transfer recommendation.  The committee recommended that prison

18  officials transfer plaintiff to either San Quentin State Prison or the California Men's Colony.  In

19  making their recommendation, the UCC noted that plaintiff was on Close B custody status.

20  Inmates designated as Close B custody status must be housed in units within an established

21  security perimeter, must participate in program activities during specified times, and must be

22  under direct and constant supervision by correctional staff at all times.  A small subset of CDCR

23  institutions can accommodate inmates with Close B status.  (Defs.' SUDF 7-10 & Ex. F-2,

24  Garcia Decl., Alkire Am. Decl., Cal. Code Regs., tit. 15, § 3377.1(a)(4).)

25         On April 15, 2008, defendant Garcia reviewed plaintiff's case file and endorsed

26  him for transfer to CCC, located in Susanville, California.  At the time, there was no medical

1   chrono recommending plaintiff's transfer to a low-altitude institution in plaintiff's central file.

2   During his deposition, plaintiff admitted that there was no such chrono yet issued as of that date.

3   On April 30, 2008, plaintiff transferred to CCC.  (Defs.' SUDF 11-13 & Ex. F-3, Garcia Decl.,

4   Pl.'s Dep.)

5           On June 11, 2008, plaintiff submitted an inmate appeal concerning his transfer to

6   CCC.  On July 16, 2008, defendant Renauld denied plaintiff's appeal at the first level of review.

7   In denying the inmate appeal, defendant Renauld deferred to the judgment of the CSR, who is

8   responsible for determining the appropriate institution for an inmate.  (Defs.' SUDF 14-16 &

9   Exs. F-4 & F-5, Renauld Decl.)

10          On July 9, 2008, plaintiff saw Dr. Handke, an out-of-state pulmonary specialist

11  located in Reno, Nevada.  Dr. Handke diagnosed plaintiff with Stage III Sarcoidosis, noted that

12  plaintiff had not previously been treated for Sarcoidosis, and recommended prednisone therapy.

13  Dr. Handke recommended that prison officials transfer plaintiff to an institution located at a

14  lower altitude.  On the same day, CCC medical staff issued plaintiff a CDC 128C medical

15  chrono.  The chrono stated that plaintiff had restricted mobility due to a lung disorder and that

16  "I/M requires placement at a lower altitude institution under ADA guidelines."  CCC medical

17  staff also issued plaintiff a CDC 1845 Disability Placement Program Verification document.  It

18  indicated that plaintiff was mobility impaired ("DPM") and that plaintiff could not walk more

19  than 100 yards due to a lung disorder.  It also noted that plaintiff required a lower-bunk, lower-

20  tier placement.  (Defs.' SUDF 17-20 & Exs. F-6-F-9.)

21          On July 15, 2008, CCC medical staff issued plaintiff a second CDC 128C medical

22  chrono.  This chrono noted that plaintiff needed to be at a low-altitude institution not located in

23  the Valley Fever endemic area and that plaintiff had DPM status.  It also noted that plaintiff did

24  not have a physical impairment that would prevent him from being on a top tier or top bunk.

25  (Defs.' SUDF 21-22 & Ex. F-9.)

26  /////

1          On July 16, 2008, plaintiff appeared before the CCC UCC for a transfer review.

2   The committee recommended that prison officials transfer plaintiff to either CMF or SVSP.  In

3   making its recommendation, the UCC considered PVSP CMO Igbinosa's March 17, 2008

4   medical recommendation as well as CCC's July 9, 2008, medical chrono and CDC 1845

5   Disability Placement Program Verification document.  The UCC also noted that plaintiff was on

6   Close B custody status.  The UCC drafted a 128G Classification Chrono which outlined the case

7   factors they considered and stated the recommendation for transfer.  The UCC did not consider

8   plaintiff's second medical chrono issued on July 15, 2008 because it is likely the chrono had not

9   been placed in plaintiff's central file by July 16, 2008.  (Defs.' SUDF 23-24 & Ex. F-10, Alkire

10   Am. Decl.)

11          On July 23, 2008, defendant Alkire reviewed plaintiff's case file and determined

12   that the institutions the UCC recommended for plaintiff's transfer were not available.  CMF had

13   no suitable bed space for plaintiff at that time, and SVSP could not house plaintiff because he

14   was part of the general population.  (Alkire Am. Decl. (Doc. No. 78-1) at 3, ¶15.)  Defendant

15   Alkire noted that plaintiff met the Valley Fever organism susceptibility criteria, per the March

16   17, 2008 chrono authored by CMO Igbinosa, and stated that plaintiff should not be retained or

17   transferred into the endemic or affected areas unless there is a change in his medical condition.

18   Defendant Alkire also noted that plaintiff had a violent history, an escape history, and that

19   plaintiff was on Close B custody status.  (Defs.' SUDF 24-26 & Ex. F-11, Alkire Am. Decl.)

20          When there are very few institutions that can accommodate an inmate, a CSR will

21   review the case with a Correctional Counselor III ("CCIII"), Classification Services Unit, a

22   representative of Population Management   The CCIII's are particularly knowledgeable about

23   what institutions can accommodate an inmate down to the bed.  Defendant Alkire reviewed

24   plaintiff's case with B. Moak, CCIII, CSU.  Based on plaintiff's Valley Fever susceptibility,

25   DPM classification, and Close B custody status, defendant Alkire and Moak identified CMF and

26   HDSP as the only two institutions that could accommodate him.  As noted above, CMF did not

1    have bed space for plaintiff.  Specifically, CMF did not have a lower-bunk, lower-tier bed

2    available.  As such, HDSP was the only prison that could accommodate plaintiff's medical needs,

3    so defendant Alkire endorsed plaintiff for transfer there.  At the time, defendant Alkire was not

4    aware of plaintiff's second medical chrono issued on July 15, 2008, clarifying that plaintiff did

5    not have a physical impairment that would prevent him from being on a top tier or top bunk.

6    Typically, it takes more than a week before a medical chrono is prepared and filed in an inmate's

7    central file. (Defs.' SUDF 27-31, Alkire Am. Decl.)

8              On August 1, 2008, plaintiff submitted an inmate appeal concerning his transfer to

9    HDSP.  On August 19, 2008, defendant Renauld reviewed the appeal at the first level of review.

10   Defendant Renauld denied plaintiff's inmate appeal and noted that defendant Alkire was aware

11   of the transfer criteria.  (Defs.' SUDF 31-34 & Exs. F-12 & F-13, Renauld Decl.)

12             Plaintiff received appropriate care for his Sarcoidosis.  While at CCC and HDSP

13   from 2008 through 2010, primary care providers examined plaintiff virtually every month.

14   Plaintiff also saw pulmonary specialists no fewer than four times.  He received an aggressive

15   course of prednisone and also used supplemental oxygen on occasion.  No authoritative medical

16   text describes any medical benefit to be gained by moving patients with lung disease from 5,000

17   feet to a lower altitude, as the difference in oxygen supply between 5,000 feet and a lower

18   altitude is insignificant.  There was no medical necessity for plaintiff to move from HDSP to a

19   prison at lower altitude.  There is no evidence that his condition would have improved had he

20   been housed at a lower altitude.  Plaintiff suffered no adverse consequences from being housed at

21   CCC or HDSP.  His condition did not deteriorate, and he suffered no impairment to his daily life.

22   His oxygen levels were normal.  In 2010, plaintiff's Sarcoidosis went into remission, and he

23   stopped taking steroids.  (Defs.' SUDF 35-37, Barnett Decl.)          .

24             Given the evidence submitted by defendants in support of the pending motion for

25   summary judgment, the burden shifts to plaintiff to establish the existence of a genuine issue of

26   material fact with respect to his inadequate medical care claims.  As noted above, on defendants'

1   motion for summary judgment, the court is required to believe plaintiff's evidence and draw all

2   reasonable inferences from the facts before the court in plaintiff's favor.  The court has reviewed

3   plaintiff's verified complaint and his opposition to defendants' motion.  Drawing all reasonable

4   inferences in plaintiff's favor, the court concludes that plaintiff has not submitted sufficient

5   evidence in this action to create a genuine issue of material fact with respect to his claim that

6   defendants violated his rights under the Eighth Amendment.

7          Specifically, the evidence presented by plaintiff fails to demonstrate that

8   defendants responded to plaintiff's serious medical needs[1] with deliberate indifference or acted in

9   conscious disregard of an excessive risk to plaintiff's health.  See Farmer, 511 U.S. at 834 &

10  837; Estelle, 429 U.S. at 106.  First, plaintiff argues that defendant Garcia knew about plaintiff's

11  medical conditions before he approved him for transfer to CCC.  (Pl.'s Opp'n to Defs.' Mot. for

12  Summ. J. at 6-9.)  In particular, plaintiff contends that defendant Garcia's transfer review was

13  initiated out of medical necessity based on CMO Igbinosa's March 17, 2008, recommendation.

14  (Id.)  However, there is no indication in CMO Igbinosa's recommendation that plaintiff needed a

15  transfer to a low-altitude institution.  In CMO Igbinosa recommendation, he recommended

16  plaintiff for transfer out of PVSP "due to his medical condition(s) that increase(s) his risk of

17  complications from potential Valley Fever infections."  Based on CMO Igbinosa's

18  recommendation, as well as defendant Garcia's independent review of plaintiff's central file,

19

20        [1] The parties do not dispute, and undersigned finds, that based upon the evidence
    presented by the parties in connection with the pending motion for summary judgment a
    reasonable juror could conclude that plaintiff's Sarcoidosis constitutes an objective, serious

21  medical need.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable
    doctor or patient would find important and worthy of comment or treatment; the presence of a

22  medical condition that significantly affects an individual's daily activities; or the existence of
    chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for

23  medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the
    Eighth Amendment duty to provide medical care applies "to medical conditions that may result

24  in pain and suffering which serve no legitimate penological purpose.").  Specifically, plaintiff's
    largely undisputed medical history, as well as the observations and treatment recommendations

25  by plaintiff's outside treating physicians and prison officials compel the conclusion that
    plaintiff's medical condition, if left untreated, could result in "further significant injury" and the

26  "unnecessary and wanton infliction of pain."  McGuckin, 974 F.2d at 1059.

1   plaintiff's medical needs, the availability of suitable institutional programs, housing, and

2   transportation, and a Felony Hold on plaintiff from the State of Nevada, defendant Garcia

3   endorsed plaintiff for transfer to CCC.  (Defs.' Ex. F-3 & Garcia Decl.)  The only medical

4   restriction plaintiff had at the time defendant Garcia endorsed plaintiff for transfer to CCC was

5   he needed to be outside of the Valley Fever endemic area.  (Id.)  CCC is outside the Valley Fever

6   endemic area.  (Id.)

7          Plaintiff has not submitted any evidence to show that he notified the UCC or

8   defendant Garcia that he needed to be housed at a low-altitude institution.  The medical chrono

9   specifically recommending plaintiff's transfer to a low-altitude institution was not prepared until

10  plaintiff saw Dr. Handke in July 2008, three months after defendant Garcia endorsed plaintiff for

11  transfer to CCC.  (Defs.' Ex. F-7.)  It is well established that "prison officials who lacked

12  knowledge of a risk cannot be said to have inflicted punishment."  Farmer, 511 U.S. at 844.  In

13  this regard and given this evidence, even though CCC is at a higher altitude than PVSP, there

14  simply is no evidence that defendant Garcia was deliberately indifferent to plaintiff's serious

15  medical needs.  Accordingly, defendant Garcia is entitled to summary judgment in his favor.[2]

16         Next, plaintiff argues that defendant Alkire knew about plaintiff's medical

17  condition and need for a transfer to a low-altitude institution but still approved his transfer to

18  HDSP, a neighboring institution at the same or a slightly higher altitude than CCC.  (Pl.'s Opp'n

19  to Defs.' Mot. for Summ. J. at 9-14.)  In particular, plaintiff notes that when defendant Alkire

20  conducted her transfer review, she considered the July 9, 2008 medical chrono, which states

21  "*I/M requires placement at low altitude institution under ADA guidelines."  (Id. Ex. C.)  To be

22

23         [2] Plaintiff insists that even if defendant Garcia did not know plaintiff needed to be
     housed at a low-altitude institution, he should have known as much.  However, even if defendant
24   Garcia should have known of plaintiff's need for housing at a low-altitude prison, this would not
     be sufficient to defeat summary judgment because under the deliberate indifference standard a
25   prison "official must both be aware of facts from which the inference could be drawn that a
     substantial risk of serious harm exists, and he must also draw the inference."  See Farmer, 511
26   U.S. at 838.

1  sure, deliberate indifference can manifest when prison officials ignore express orders from

2  outside treating physicians.  See Snow, 681 F.3d at 988 (non-treating, non-specialist physicians

3  may have been deliberately indifferent to prisoner's needs when they repeatedly denied outside

4  specialists' recommendations for hip-replacement surgery); Jett, 439 F.3d at 1097-98 (prison

5  doctor may have been deliberately indifferent to a prisoner's medical needs when he decided not

6  to request an orthopedic consultation as the prisoner's emergency room doctor had previously

7  ordered).

8          However, here the evidence establishes that plaintiff had several competing

9  medical needs and case factors that defendant Alkire was required to consider before endorsing

10 him for a transfer.  (Am. Alkire Decl.)  Specifically, plaintiff was classified as DPM or mobility

11 impaired by a physician and needed a lower bunk and lower tier placement.  (Id.)  Since CCC

12 was unable to house DPM inmates plaintiff needed a transfer to an institution that could.  (Id.)

13 Plaintiff also met the Valley Fever organism susceptibility criteria and needed to be housed

14 outside the Valley Fever endemic areas.  (Id.)  Finally, plaintiff has a violent history, an escape

15 history, and has a Close B custody status.  (Id.)  Only certain institutions can accommodate Close

16 B custody inmates.  (Id.)

17         When the number of institutions that can accommodate an inmate is so limited,

18 defendant Alkire consults a CCIII, CSU representative of Population Management.  (Am. Alkire

19 Decl.)  In this case, defendant Alkire consulted with CCIII Moak, and they determined that only

20 two institutions could accommodate an inmate so severely limited: CMF and HDSP.  (Id.)  The

21 UCC recommended plaintiff transfer to CMF or SVSP.  However, defendant Alkire could not

22 transfer plaintiff to CMF because it did not have a lower tier, lower bunk available at the time[3],

23

_____

24      [3]  The undersigned notes that it views the defense evidence on this point with some
    degree of skepticism since it is somewhat difficult to fathom that a single bed meeting the criteria
25  could not have been created at CMF by transfer of another prisoner or otherwise.  However,
    plaintiff has not contested defendants' evidence in this regard and has come forward with no
26  evidence of his own demonstrating a disputed issue of fact.

1  and SVSP was designated for Sensitive Needs Yard inmates.  (Id.)  Plaintiff was a general

2  population inmate.  (Id.)  The evidence before the court on summary judgment establishes that

3  HDSP was the only prison that could accommodate plaintiff.  (Id.)  Specifically, HDSP could

4  accommodate plaintiff's DPM status, provide plaintiff a lower bunk on a lower tier, and was

5  outside the Valley Fever endemic area.  (Id.)  When defendant Alkire endorsed plaintiff for a

6  transfer to HDSP, she was aware of the recommendation that plaintiff transfer to a low-altitude

7  institution.  (Id.)  However, plaintiff's DPM status, need to be outside of the Valley Fever areas,

8  and custody status were higher-priority criteria considerations.  (Id.)

9          Most importantly perhaps, plaintiff has not submitted any evidence on summary

10  judgment even suggesting that defendant Alkire acted with a culpable state of mind or that her

11  conduct rose to the level of "subjective recklessness."  See Farmer, 511 U.S. at 839-40.  Based

12  on the evidence of record, the court finds that defendant Alkire has established that she acted

13  reasonably when she endorsed plaintiff for transfer to HDSP.  Where a prison official knows of a

14  substantial risk to an inmate's health but responds reasonably to the risk, he or she cannot be

15  found liable under the Cruel and Unusual Punishments Clause, even if harm is ultimately not

16  averted.  See Farmer, 511 U.S. 825, 844-45.  Here, plaintiff had to be transferred from CCC.

17  HDSP was the only institution available that met all of plaintiff's other medical and case factor

18  needs at the time.  Although HDSP is not a low-altitude institution, it neighbors CCC in

19  Susanville and at least maintained the status quo with respect to plaintiff's housing needs with

20  respect to altitude.

21          Moreover, even assuming for the sake of argument that defendant Alkire's

22  decision to endorse plaintiff for transfer to HDSP was not reasonable or defendant Alkire failed

23  to take adequate measures to abate any risk to plaintiff, defendant Alkire's decision at most

24  constituted neglect or indifference, not deliberate indifference.  See McGuckin, 974 F.2d at 1060

25  ("A finding that the defendant's neglect was an 'isolated occurrence' or an 'isolated exception,' .

26  . . militates against a finding of deliberate indifference"); Wood, 900 F.2d at 1334 ("In

1   determining deliberate indifference, we scrutinize the particular facts and look for substantial

2   indifference in the individual case, indicating more than mere negligence or isolated occurrences

3   of neglect.").  In this regard, even though HDSP is at the same or a slightly higher altitude than

4   CCC, this court cannot say based on the evidence presented in connection with the pending

5   summary judgment motion that there is any evidence that defendant Alkire was deliberately

6   indifferent to plaintiff's serious medical needs.  Accordingly, defendant Alkire is entitled to

7   summary judgment in her favor.

8           Finally, plaintiff argues that defendant Renauld, as associate warden, had the

9   power to rescind plaintiff's transfer orders but twice failed to act and also denied plaintiff's

10   inmate appeals challenging the transfers.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 15-18.)

11   Defendant Renauld's involvement in this case is limited to his participation in the inmate appeals

12   process.  In light of the conclusion reached herein that evidence is lacking of defendants Garcia

13   and Alkire deliberate indifference to plaintiff's serious medical needs when they endorsed his

14   transfer to CCC and HDSP respectively, defendant Renauld, who merely responded to plaintiff's

15   inmate appeals regarding those transfers, likewise cannot be found to have been deliberately

16   indifferent to plaintiff's serious medical needs.  Accordingly, defendant Renauld is entitled to

17   summary judgment as well.

18           In short, based upon the evidence presented on summary judgment the court finds

19   that defendants were not deliberately indifferent to plaintiff's serious medical needs in violation

20   of the Eighth Amendment.  Accordingly, defendants' motion for summary judgment should be

21   granted.[4]

22   /////

23   

24       [4] Defense counsel also argues that the court should grant defendants' motion for
     summary judgment because plaintiff did not suffer any harm as a result of his transfers to CCC
25   and HDSP and because defendants are entitled to qualified immunity.  In light of the
     recommendation that defendants' motion for summary judgment be granted on the merits of
26   plaintiff's Eighth Amendment claims, the court declines to address these alternative arguments.

**CONCLUSION**

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendants' motion for summary judgment (Doc. No. 69) be granted;

2. Any other pending motions (Doc. Nos. 76 & 77) be denied as moot; and

3. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 3, 2013.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
bost1782.57(2)